# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 11, 2011

## JOSE E. MOLINA, aka ROBERTO C. PEREZ
## v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
No. 2003-B-1303      Cheryl Blackburn, Judge

**No. M2010-00447-CCA-R3-PC - Filed April 8, 2011**

The Petitioner, Jose E. Molina, aka Roberto C. Perez, was convicted by a jury of aggravated rape and aggravated robbery and was, thereafter, sentenced to an effective sentence of twenty-one years at 100%. This Court affirmed the Petitioner's convictions on direct appeal. The Petitioner filed a timely petition for post-conviction relief and, following an evidentiary hearing, the post-conviction court denied relief. In this appeal, the Petitioner raises the following issues for review: (1) the post-conviction court erred in its determination that the Petitioner's trial counsel was effective; and (2) in light of a recent publication, the fingerprint comparison testimony at his trial should be excluded as scientifically unreliable. Following our review, we conclude that the Petitioner has not shown he is entitled to relief. We affirm the Davidson County Criminal Court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Charles Walker, Nashville, Tennessee, for the appellant, Jose E. Molina, aka Roberto C. Perez.

Robert E. Cooper, Jr., Attorney General and Reporter Lindsy Paduch Stempel, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

Following a jury trial in October 2004, the Petitioner was convicted of aggravated rape and aggravated robbery. See Tenn. Code Ann. §§ 39-13-502, -402. Thereafter, the trial court imposed a sentence of twenty-one years for the aggravated rape, to be served at 100%, and a concurrent sentence of nine years for the aggravated robbery. See State v. Jose E. Molina, No. M2005-01033-CCA-R3-CD, 2006 WL 2069429, at *1 (Tenn. Crim. App., Nashville, July 25, 2006), perm. to appeal denied, (Tenn. Jan. 14, 2009). On direct appeal, this Court summarized the facts established at trial as follows:

> On the morning of January 31, 2003, the victim . . . was threatened with a knife, robbed of her money, and raped. The victim, who was pregnant and suffering from morning sickness at the time, was babysitting two children. Just after the parents had left, she heard a knock at the door. When she answered, the [Petitioner] asked if her husband was home, explaining that he was there for a job he had promised. When she informed him that her husband was not home and asked the [Petitioner] to leave a message, the [Petitioner] entered the apartment as she turned for a pen and paper. After asking for a glass of water, the [Petitioner] made his way toward the victim, grabbed her by her hair, pulled a knife from his pocket, and forced her into a bedroom. He then demanded money. She complied, hoping "[h]e would just take it and go," and handed him a gift certificate, which he dropped onto the floor. According to the victim, the [Petitioner] then pointed the knife to her neck and ordered her to get on the bed and remove her clothes. At that point, she begged him not to hurt her or her baby and the [Petitioner] agreed to use a condom that she provided. He penetrated the victim vaginally while continuing to hold the knife to her neck. When he left the apartment, she checked on the children and then called her husband, who summoned the police. She estimated that the [Petitioner] was in her apartment for twenty to twenty-five minutes. Later, the victim identified the [Petitioner] from a photographic lineup. She also identified the [Petitioner] at trial.

> On cross-examination, the victim acknowledged that she had never seen the [Petitioner] before the rape and robbery and agreed that she initially assumed the [Petitioner] "was legitimate and there to talk to [her] husband." The victim confirmed that she had reported to police that the [Petitioner] appeared to be Hispanic. She estimated his age and height, described his clothing, and recalled that he did not have any pubic hair. She conceded that she did not tell the police of any scars or other distinguishing marks on the

[Petitioner], explaining that he never took off his jacket and that she did not notice any hand tattoos.

During the trial, the victim's husband . . . testified that he received a call at approximately 10:30 a.m. from his wife, who told him that she had been robbed. He rushed home and found her "on the couch, all curled up, crunched up." When she reluctantly told him that she had also been raped, he immediately called 911.

The victim's neighbor, Etta Pruett-Smith, testified that on the morning of the robbery and rape, a man had knocked on her door to ask if any "Spanish people" lived next door. She recalled that she answered,"yes," shut her door, and shortly thereafter made a trip to a bank. When she returned about twenty minutes later, the police had blocked the entrance to her apartment and an officer informed her that the victim had been raped. Ms. Pruett-Smith first exclaimed, "He raped her?". She then informed the officers that a man had knocked on her door earlier that morning and asked about her neighbors. Later, she selected the [Petitioner] from a photographic lineup, identifying him as the man who had been to her apartment that morning. She described her identification as "very sure" and remembered signing a paper that documented which photo she had selected.

Detective Suzanne Stephens with the Metropolitan Nashville Police Department testified that the victim underwent a Medical/Legal Examination by a team of nurse practitioners at the hospital. She stated that although the exam did not provide any evidence linking the [Petitioner] to the crime, that result was not surprising because the [Petitioner] had worn a condom. She recalled that the victim gave consistent descriptions of the [Petitioner], noting that he obviously had bad teeth. When the [Petitioner] was arrested, Detective Stephens observed that he did indeed have "really bad teeth . . . [with] some kind of fillings that were noticeable." She testified that when she compiled photographs for the lineup, she selected photos of five men who looked similar to the [Petitioner]. Detective Stephens testified that the victim selected the [Petitioner] out of the lineup "more or less immediately" and with complete confidence and that on the following day, Ms. Pruett-Smith also made an "immediate" identification. She testified that each woman also signed a "photo identification form" confirming their selection of the [Petitioner].

On cross-examination, the detective acknowledged that she was unaware that one of the men in the lineup was not Hispanic. She explained

-3-

that she did not know the names of the men and was basing her selections strictly upon whether the men looked similar to the [Petitioner]. The detective confirmed that the victim had recognized the cologne that the [Petitioner] had worn and had also reported to her that the [Petitioner] did not have any pubic hair. The detective conceded that officers made no investigation as to whether the [Petitioner] had any pubic hair, explaining "that is something that could change quickly." Detective Stephens also testified that she did not recall the victim saying that the assailant had tattoos.

Charles Ray Blackwood, Jr., an officer in the Identification Section of the Metropolitan Nashville Police Department, testified that he arrived at the victim's residence around 1:20 p.m. on the afternoon of January 31, 2003. He interviewed the officers at the scene and took several photographs, which were introduced into evidence. The [S]tate also introduced a crime scene diagram sketched by Officer Blackwood. He testified that he was able to detect a latent fingerprint on a gift certificate that was recovered from the victim's residence, a print that he forwarded on for examination. The officer also collected a condom wrapper at the scene and presented it as evidence at the trial.

Linda Wilson, the Metropolitan Nashville Police Department officer who analyzed the latent fingerprints found on items collected from the victim's residence, testified that she received photographs of the prints, entered the prints lifted from the gift certificate into a computer database known as the Automatic Fingerprint Identification System, and received a list of known fingerprint candidates. She testified that the first candidate on the list was the [Petitioner]. The [Petitioner's] fingerprint received a score of 3574 whereas the next candidate on the list received only a score of 830, which, Ms. Wilson agreed, was a "fairly significant difference" indicating that the print on the gift certificate matched that of the [Petitioner]. The officer testified that she had not spoken to anyone involved in the investigation prior to examining the fingerprints. She explained that she also personally compared the print recovered from the gift certificate and the [Petitioner's] fingerprints and determined that they matched. She testified that her supervisor verified her conclusion. On cross-examination, however, Officer Wilson acknowledged that there was no way to determine the age of a latent print. She confirmed that the victim and her husband provided their fingerprints to her office to be used to eliminate prints found at the scene. The officer stated that she analyzed ten to twelve prints recovered from the scene, including a palm print, and was unable to determine who left the majority of those prints.

-4-

At the close of the [S]tate's case, it was stipulated that the [Petitioner] was arrested on charges related to this case on February 11, 2003, and had remained in custody continuously since that date.

Miguel Coias, an investigator with the Public Defender's Office, testified that he took pictures of the [Petitioner's] teeth and hands on the previous day. These photographs were introduced into evidence. The defense then rested its case.

Id. at *1-3.

After this Court affirmed the Petitioner's convictions on direct appeal, no further action was taken until the Petitioner filed a pro se petition for post-conviction relief on May 20, 2008. After a hearing, the Petitioner was granted permission to proceed with a delayed appeal to the Tennessee Supreme Court. Our supreme court denied the application for permission to appeal on January 14, 2009.

The Petitioner then filed another pro se petition for post-conviction relief on February 20, 2009. Counsel was appointed to represent the Petitioner in his post-conviction action, and two amendments to the petition were filed thereafter. As specific claims for relief, the Petitioner argued as follows: (1) Trial counsel was ineffective for advising the Petitioner to waive his right to testify in his own defense; (2) Trial counsel was ineffective for failing to argue or pursue an alibi defense; (3) Fingerprint comparison evidence should be excluded as unreliable in light of a recent publication on the subject.

A hearing was held in the post-conviction court, at which Maria Catalina Molina (the Petitioner's ex-wife and alleged alibi witness), the Petitioner, and trial counsel testified. After hearing the evidence presented, the post-conviction court denied relief by written order dated February 12, 2010. This appeal followed.

**Analysis**

On appeal, the Petitioner first contends that trial counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions at trial. Next, he submits the fingerprint comparison testimony presented at his trial should be excluded as unreliable.

**I. Standard of Review**

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. To sustain a petition for post-conviction relief, a petitioner

must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

## II. Ineffective Assistance of Counsel

As specific grounds of ineffectiveness, the Petitioner makes the following claims: (1) Trial counsel was ineffective for advising him to waive his right to testify in his own defense; and (2) Trial counsel was ineffective for failing to argue or pursue an alibi defense. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

The post-conviction court made detailed findings on the issue and found that the Petitioner received the effective assistance of counsel. Regarding the failure to present an alibi defense, the post-conviction court concluded as follows:

> Petitioner asserts that trial counsel failed to advise him of the defense of alibi, and that prior to trial, he informed trial counsel that he was with Maria Catalina [Molina], his ex-wife, at her residence when the crime was committed.
>
> At the evidentiary hearing, Petitioner testified that he told trial counsel that he was with his wife at the time the offense occurred. Ms. [Molina] was called to testify and she corroborated that Petitioner was with her at their apartment. She said she would have testified on Petitioner's behalf had she been called for trial. But, she stated that she was never contacted by trial counsel, only by post-conviction counsel. She testified she did not visit Petitioner while he was in jail and was unfamiliar with the name Angelica Rojas who was listed as Petitioner's spouse on the jail visitation records.
>
> In contrast, Petitioner's trial counsel testified that Petitioner informed her he was alone at the time the offense occurred and he did not provide any information about potential alibi witnesses. She referred to the investigator's notes which indicated Petitioner said he was single and that he also told the investigator he was home alone. She further testified that her own notes reflect they discussed his absence of alibi on multiple occasions. The [c]ourt finds

trial counsel's testimony to be credible. Petitioner has failed to establish by clear and convincing evidence that his trial counsel was ineffective by not filing an alibi notice nor that he was prejudiced by this alleged deficiency.

Addressing trial counsel's advice to the Petitioner not to testify, the post-conviction court determined as follows:

Petitioner asserts he was advised by trial counsel to waive his right to testify but that he was not informed should he waive his right the jury would not hear any evidence that he was somewhere else at the time of these offenses.

At the evidentiary hearing Petitioner testified that his trial counsel told him not to testify. He conceded that he recalled the judge talking to him about the decision to testify and informing him it was his decision alone to make. He also identified his signature on the Momon waiver. Had he testified at trial, Petitioner stated he would have told the jury the truth that he did not commit the crime and that he was home at his apartment with his wife, their two children, and his sister-in-law.

Trial counsel testified that she did not specifically recall advising Petitioner about testifying in his defense, but she acknowledged that Petitioner was probably correct that she advised him not to testify since he indicated he was not present and did not know anything about the events that were the subject of the indictment. She said it is generally her practice to advise her clients that it is their decision whether or not to testify.

The [c]ourt finds trial counsel's testimony is credible. Although the decision to testify ultimately rests in the hands of [a] defendant, the role of trial counsel is to advise [a] defendant and that is what [trial counsel] did in this case. Further, the record reflect[s] that during Petitioner's trial the [c]ourt conducted a hearing pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999), advising Petitioner of his right to testify and Petitioner elected to waive his right, executing the Momon waiver.

Petitioner has failed to demonstrate by clear and convincing evidence that trial counsel prohibited him from testifying or that he was prejudiced by any alleged deficiency. [Trial counsel] merely advised in [her] capacity as trial counsel that [s]he felt it was not in Petitioner's best interests to testify. Further the testimony Petitioner gave at his evidentiary hearing contradicted the information he provided to trial counsel during trial preparation, so had [trial

counsel] permitted Petitioner to testify about being at his apartment with his wife when he advised her and the investigator that he had been alone and was not married, she would have potentially been suborning perjury.

The Petitioner argues that trial counsel failed to argue or pursue an alibi defense, claiming that he told trial counsel he was at home with his ex-wife when the crime was committed, but trial counsel failed to follow up on the matter. According to trial counsel, she met with the Petitioner on several occasions to discuss his lack of an alibi; however, the Petitioner did not provide her with any information regarding possible alibi witnesses. Trial counsel stated that her notes reflected that the Petitioner told her he was home alone at the time the crime occurred, and she reviewed the investigator's notes, which reflected that the Petitioner stated that he was home alone during the relevant time period, that he was single and lived alone, and that he had not been in Nashville very long and knew no one. The post-conviction court accredited trial counsel's testimony.

With respect to the issue of the Petitioner's right to testify, the Petitioner alleged that, had he testified at trial, he would have told the jury of his alibi and that without this testimony the jury heard no evidence of his defense. The post-conviction court determined that the trial court properly held a hearing in accordance with Momon to determine if the Petitioner wished to testify. At the Momon hearing, the Petitioner elected to waive his right to testify and executed the Momon waiver after being advised of said right. The record contains a waiver, signed by the Petitioner, of his right to testify. Trial counsel stated that she likely advised the Petitioner not to testify because he indicated he was not present at the scene and was home alone on the evening in question, having "nothing to add" to his defense. Trial counsel testified it was her general practice to advise clients that the ultimate decision of whether or not to testify was theirs alone to make. The post-conviction court determined that trial counsel "merely advised in [her] capacity as trial counsel that [s]he felt it was not in Petitioner's best interest to testify." Again, the post-conviction court found trial counsel's testimony to be more credible on the issue than the Petitioner's. Based upon this evidence, we conclude that trial counsel's advice to the Petitioner regarding whether to testify was not the deficient performance required for an affirmative showing of the ineffective assistance of counsel.

The record supports the detailed findings of the post-conviction court. We conclude that the Petitioner established neither deficient representation by counsel nor prejudice from the shortcomings which he alleged.

### III. Fingerprint Comparison Evidence
On appeal, the Petitioner argues that this Court, based upon a recent publication on the subject, should find fingerprint comparison evidence to be unreliable and grant him post-

conviction relief. The article to which the Petitioner refers is from the National Academy of Forensic Examiners ("Strengthening Forensic Science in the United States: A Path Forward") and was published in 2009, several years after the Petitioner's October 2004 trial.

In the trial court proceedings, trial counsel did challenge the expert testimony by requesting a jury-out hearing to determine whether the expert's testimony was reliable. In filing that motion, trial counsel relied on a federal case that held fingerprint comparison evidence was unreliable. However, the federal court then reconsidered its decision and determined to the contrary. See United States v. Llera Plaza, 188 F. Supp. 2d 549 (E.D. Pa. 2002). Thereafter, the trial court in this case denied the Petitioner's motion, finding that Tennessee courts had routinely found fingerprint evidence to be admissible.

Relying on Tennessee Rule of Evidence 703 and McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997), the Petitioner now asks this Court, in light of this new report, to grant post-conviction relief and hold that fingerprint comparison evidence is scientifically unreliable. Because this is an evidentiary issue, not a constitutional issue, it is not a cognizable claim for post-conviction relief. See Tenn. Code Ann. § 40-30-103 ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."); see also Joseph Vermeal v. State, M2007-01676-CCA-R3-PC, 2008 WL 2648939, at *9 (Tenn. Crim. App., Nashville, July 3, 2008).

## Conclusion

First, the Petitioner has failed to show that he did not receive the effective assistance of counsel at trial. Second, the Petitioner's claim of unreliable fingerprint comparison evidence is not a cognizable ground for post-conviction relief. The Davidson County Criminal Court's denial of post-conviction relief is affirmed.

_____
DAVID H. WELLES, JUDGE